Our second case on the call of the docket is Agenda No. 10, Case No. 113783, Julie Q. v. Department of Children & Family Services. Counsel for the appellant, please proceed. Thank you, Your Honors. Good morning, Counsel. May it please the Court. Nadine Wickern, Assistant Attorney General on behalf of the Department of Children & Family Services. In this case, the Department's Director upheld an indicated finding under the Abused and Neglected Child Reporting Act against Julie Q. because there was evidence that she was an alcoholic who was drinking during the evening of January 29, 2009, to the point that she was failing to provide adequate supervision, protection, and care for her then nine-year-old daughter. This indicated finding should not be disturbed by this Court for any of the three reasons raised by Julie Q. First, allegation of harm 60, under which the indicated finding was made, is not void because it implements rather than exceeds the Department's authority that was granted to it by the General Assembly under the Act. Second, the evidentiary rulings made during the administrative hearing in this case were proper and thus were not against the manifest weight of the evidence. Finally, if a due process right was implicated here, Julie Q. received all the process that was due because the Director's decision was rendered within 90 days of her request for a hearing. On the first issue, Your Honors, regulation, allegation of harm 60, is not void. When the Department promulgated allegation of harm 60 in 2001, it had authority to do so based on the Act's definition of neglected child that was in the Act at the time. Contrary to the appellate court majority and Julie Q.'s interpretation of the Act, the definition is not limited to only four circumstances. If I may, I'd like to walk through that definition. Under the Act, neglected child is a child who is not receiving proper or necessary nourishment or medically indicated treatment, proper or necessary support or medical or other remedial care, or other care necessary for the child's well-being, including adequate food, clothing, and shelter. And the Act goes on to define three more instances, that the child has been abandoned by his parents, has received crisis intervention services and the parents will not permit him to return home, or is born with controlled substances in his system. That first part of this four-part definition contains the phrase, other care necessary for the child's well-being, including adequate food, clothing, and shelter. By using that word, including, in that first part of the definition, the General Assembly plainly indicated that the subsequent list was not meant to be exhaustive. And it was on that basis that the Department promulgated allegation of harm 60. That is why limiting the definition to just those four instances would not only undermine allegation of harm 60, that's at issue in this case, but several of the other administrative regulations promulgated by the Department as well, which we describe at page 25 and 26 of our brief. And relevant here, allegation of harm 60, which is entitled environment injurious to the health and welfare of a child, provides that placing a child in an environment that is injurious to his or her health and welfare constitutes neglect. That regulation lists several examples that further define that phrase, which include exposing a child to the use of alcohol, which is the other factors to consider, such as the child's age and the child's ability to protect himself and the parent's ability to control his or her actions. It also takes into account the severity and frequency of the neglect. Regardless of how allegation of harm 60 is framed, the examples listed clearly constitute neglect. And it may be the case that in some cases, not just one day can be looked at to determine neglect. For example, in this case, neglect is not just one day, it's multiple days. To understand how the nine-year-old child reacted to her mother's drinking is only understood by examining the history of the mom's alcoholism and that effect on the child. So while one day was what precipitated the report, I think that in some cases a determination of neglect can take into account more than what happened on just one day. And I would ask the court to, you know, be careful in how it words an opinion, because a lot of these cases, as the court's cases under the Juvenile Court Act make clear, do not depend on what happened on one day. Even the regulation, the substantive definition, the severity and frequency is to be considered, the child's age, the parent's ability to control his actions. Those aren't things that indicate that only one day may be relevant. There was, the father testified that when he first called, he said that the child said that she was locked in her bedroom, but then corrected himself to say she was told not to leave her bedroom. And the department did investigate to determine whether He corrected himself at which point? I'm sorry? At which point did he correct that statement? It's not totally clear from his testimony, but as soon as the department went and looked to see that there was no lock on the outside, the mother said she wasn't locked in the bedroom. And in fact, when Anelia Coberta went to talk to the daughter on January 31st, she said she wasn't locked in her bedroom. So that quickly fell out of the case. And how does that weigh into the final determination? The final determination included that she was not locked in her bedroom. So the indicated finding was not based on that, that allegation at all. It was based on the mother drinking to the point of not being able to provide supervision and care for her daughter. And on the fact that she was not locked in her bedroom, the history of this family became clear at the hearing. The reason that the daughter got so anxious about not having access to a phone is because she would, of the history of things that had happened in the family. There had been a house fire on her fifth birthday because of her mother drinking and falling asleep with a cigarette. So whenever her mom would pass out, she would get very nervous, especially if she didn't have access to a phone. How much weight and what significance does the amendment of the statute have on our analysis? I'm sorry, could you rephrase that? How much weight and what significance is there to the fact that this provision was taken out of the act? Well, we would submit that because there is ability under the plain language for this allegation of harm to exist, the Court does not need to resort to other tools of construction to determine whether this language that was taken out has any effect, because there was still language in the act to form a basis for this allegation of harm. But even if we were to look at those tools of construction under the Court's rule, only if a phrase that is unambiguous is removed does that have an impact on the meaning. And here, everyone agrees that this language was removed because of fear of it being too ambiguous for mandated reporters to understand. And until it could be further defined, as it is now under allegation of harm 60, the language was removed. So even the presumption that Julie Kew asked the Court to invoke cannot be invoked here, because the language that was removed was ambiguous. And also, reading the allegation of harm in the statute the way that Julie Kew suggests this Court do would lead to absurd results. As we pointed out in our brief, Section 7.16 of the act indicates that if there is a finding under the Juvenile Court Act of neglect on the basis of creating an injurious environment, then automatically under the Abused and Neglected Child Report Act, the Court would have to make a reporting act and indicated finding may be made without a hearing. So if under their reading, this environment injurious language is problematic, then there should have been an exception put in Section 7.16 for that kind of situation. The reading of the act offered by Julie Kew in the end elevates form over substance, because looking at allegation of harm 60, it is clear that the incidents of harm that it sets forth constitute neglect. Regarding the second issue of the evidentiary rulings, first during the administrative hearing in this case, Julie Kew objected to the part of the Department's investigation notes that constituted an interview with the daughter on January 31st by the weekend on-call investigator, Anelia Coberta. She objected to that being admitted into evidence on the basis that Coberta was not called to testify. Those notes are in pages R44 and 45 of the record. And as a threshold matter, Julie Kew should not be heard to bring this issue to the Court, because she had the option of subpoenaing Coberta. The Department presented Robinson to testify about the investigation, who was the primary investigator that was assigned to the case. If Julie Kew wanted to test the reliability and credibility of Coberta's interview with the daughter, she should have subpoenaed her to testify, which the Department's regulations allow. Julie Kew, Chief Justice of the U.S. Supreme Court, I mean, in other contexts, when we deal with hearsay issues, we don't usually resolve them saying, well, the objecting party could have brought in the live witness. We just say it's hearsay, it's not admissible. Why does this idea that she does have subpoena power in the administrative hearing change that analysis? Julie Kew, Chief Justice of the U.S. Supreme Court, I think the important part is in the administrative hearing and how these proceedings happen, which is the primary investigator puts together the whole report, and in this case, there were multiple people who participated in compiling the report, and that is not unusual, especially when a call comes in on the weekend. So the primary investigator is the one who looked at all of the investigation notes and made the determination. So that is the person who should testify at the hearing. And in the administrative context, like the cases we cited, Dombrowski and Kalita v. White, we can put forward the report on its own as evidence. And if the person wants to challenge the reliability of the report, it should be on them to subpoena it. It should be on the subpoena of the person to come in and testify. Because the rules of evidence are not strictly adhered to in the administrative context, correct? Counsel, what are we to do in January of 2012 that DCFS asked the legislature to amend the act to, again, add some limited authority to find neglect based on environment? Does that not reinforce the appellate court's interpretation of the 1980 version is correct? I believe just the opposite, Your Honor. It is clear that the legislature hadn't done anything since 2001 to strip the Department of Authority to indicate people under this allegation of harm 60. And in the face of the appellate court's decision, the General Assembly was moved to make clear that this language was appropriate. And we submit that there was already language in the act to make sure that we're back to a place where we might have some overlap, some duplicative, some superfluous language. It's just a recognition that I think the General Assembly feels it's better to be duplicative than ineffective in protecting children from neglect. Now that there's two ways to support allegation of harm 60 in the statute, I think supports the idea that the General Assembly should be able to do that. I'm just saying that was their recognition of the fact that they just had to rectify the confusion in there. Right. And it was quite clear in the legislative history that was in response to the appellate court's decision in this case. As we explained in our PLA and our stay motion, there's thousands of cases that are indicated under allegation of harm 60, and I think the General Assembly was trying to protect, you know, the ability of the Department to do that going forward. And I think that was the reason that the Department was able to do that going forward, regardless of what happens in this particular case for cases that have already been indicated. So I think that actually supports the idea that the General Assembly believed that this phrase in juryous environment was proper, even under the Abused and Neglected Child Reporting Act. And as we were discussing, as the fourth district recognized in the Montebello case, you know, form makes all the difference. And that's why this, these notes and these other incidents that came in during the hearing were proper under the Administrative Procedure Act. Because even though they were hearsay, they were based on a statutory duty to investigate child neglect, which makes them more reliable than, for example, as we discussed in our reply brief in response to some of the cases cited, than, you know, police reports was one example. And I think that's one of the examples that was used. And under the Department's regulation themselves, all evidence regarding child neglect may be used in determining whether an indicated finding should be upheld. Nevertheless, the appellate court and Julie Kueh assert that no reasonable person would rely on these notes because of the history of untruthfulness of the daughter. But as we explain, that is contrary to the findings that were made by the director, and in particular, the credibility determinations that were made. And the court sitting on administrative review does not usually undo those. And they have given us no reason why they should in this case. They admit that there's evidence going both ways, that there was some testimony that the daughter had lied about minor things, not having anything to do with her mother, but whether she was, she ate candy when she wasn't supposed to. So there was enough evidence for the Department, its director, to make a determination that it was actually Julie Kueh whose testimony was incredible. So in the end, a reasonable jury, a reasonable person could rely on the notes submitted by Coberta of her interview with the daughter. And on the second part of this issue, whether the other incidents could be admitted, I think we've discussed that they are at least, even the appellate court recognized, admissible to the extent of challenging Julie Kueh's credibility. She testified, I was not drinking on January 29, 2009, because I've been sober since January 29, 2006. Those incidents could come in to challenge her credibility determination, and in fact, part of the allegation of harm was whether she was exposing her child to the use of alcohol. And so that evidence was also relevant to that. On the final issue, just to make sure I touch on it before I run out of time, as a threshold matter, Julie Kueh pointed to no protected interest under the due process clause that was implicated in this case. As the court in line made clear, reputation to harm alone is not enough. In that case, the person indicated was a teacher, and so the court determined that she had lost a couple jobs because of the indicated finding, and thus a liberty interest was implicated. Julie Kueh has pointed to nothing in her case that would create a liberty interest, but in any event, the director's decision was timely rendered. There are two periods of time that are in dispute in this case. The first is the seven days between the time that the party was presiding, between May 29th and June 3rd, 2009. That time should not be attributable to the department, because it was for excusable delay for good cause. The ALJ had a family emergency, and she had submitted a few dates for the parties to agree on, and neither of those dates could be agreed on. So the ALJ that was presiding at the time rescheduled for seven days later when the party was presiding, and in fact the same thing that happened in the Lyon case where the ALJ was in a car accident and couldn't be at the hearing. They tried to have a substitute ALJ sit in to make the determination, but because she didn't have other dates available, they had to move the hearing seven more days. So that time should not be attributable to the department. And second is the 46 days between June 24th and July 20th, 2009. That time frame also should not count against the department, because it was agreed to by Julie Q's counsel. They claimed that there was a Hobson's choice that had to be made, because they couldn't subpoena people within the time, but that ignores the fact that they had asked for an expedited subpoena to be issued, and it was already. So they could have done that, or they could have done that. And only 89 days should be attributable to the department, and that was within the 90 days required to satisfy any due process right that was implicated here. Thank you. The expungement issue was not resolved at the court? That's correct. So if the plaintiff lose on both questions, it should go back? It would go back, although review of that would be de novo. So this court would be free to make that determination, but the department would not be opposed to a remand. Thank you. Thank you. Counsel for the appellee. Good morning. Michael Brody on behalf of Julie Q, and may it please the court. In any normal case, the plaintiff would be acquitted. In the general sense of the word, M.Q. was not an abused or neglected child. More importantly, as the term neglected child is defined under ANCRA, not the Juvenile Court Act, under ANCRA, M.Q. was not a neglected child on January 29, 2009. On that date, she was receiving proper and necessary care for her well-being, nourishment, support, medical care, clothing, housing, and all of the other elements contained within the statute. She was not abandoned by her parents. Her parents were fighting over her custody. She was not subject to crisis intervention services. She was not a newborn with drugs or alcohol in her system. So under the statutory definition that the agency was charged with enforcing, she was not a neglected child. I use those phrases advisedly, because we are here to apply a particular statutory definition, and that's the definition found in ANCRA. That statute does not look to environment. It does not have the environmental language found in other Illinois statutes. That statute looks to the care and well-being of the child. Now here, the agency argues that the drinking, that Julie Q's drinking had gotten to the point that she was not able to provide care for her daughter. There is no evidence in the record for that statement. None at all. The hearsay report that provides the basis for this charge, which is found in the record, begins by saying that when the child was seen two days after the report, she exhibited no signs of abuse or neglect. No signs. And there's no evidence that anything that happened on that day was caused by her not being able to care for her daughter. This case arose out of a hotline call placed by a divorcing parent after receiving advice from his divorce lawyer. It was placed the week before a custody hearing at which the custody over MQ was being addressed. And in that call, it was reported that MQ was locked in her room by a mother who had been drinking. DCFS investigated it by going out three weeks later to investigate the home and found no lock on the door. At that point, having determined that the child showed no signs of abuse or neglect and that the objective fact found in the report was not supported, DCFS should have closed its investigation. But in violation of ANCRA, it continued. And in the hearing that followed, and in this court, DCFS relies on primarily conduct involving the Lake Bluff Police Department, both before and after the incident that's at issue here. Interestingly, both those incidents resulted in reports that were unfounded. And if you look at the statute, unfounded means there was a determination by the agency that there was no credible evidence to support the charge. And under the statute, unfounded reports are inadmissible as a matter of law. So at the point we now stand, there's no evidence that Julie Q. neglected her daughter. This case, however, presents three legal issues. The first is whether under ANCRA may DCFS by regulation define conduct within the purview of neglect that the statute excludes. And the answer is no. The second is may the agency, if the statute permits that charge, may the agency base its conclusion on double hearsay, an unsigned, unsworn note in a file by a non-testifying witness about a non-testifying witness. Were there other indicia of unreliability? Again, the answer is no. And then finally, the question of timing, which I will address if time permits. So turning to the first question, the question of what the statute permits and whether delegation 60 is supported by the statute. I think the legal principle on which we base our argument is undisputed. And that is the legislature gets to define what neglect is, and its definition must be respected. And I don't believe DCFS to challenge that statement. The question, though, is does ANCRA, at the time this conduct took place, include injurious environment in the definition of neglect? And I would like to look at what the statute said and also what it didn't say. What it said was neglect was defined with reference to the care the child was receiving. Today DCFS looks to the including language, which modifies a portion of the statute. What it modifies is whether the child is receiving the proper or necessary care. Again, that was not proven here, and that does not open the statute up to a wide-ranging injurious environment inquiry. Is injurious environment within the definitions of care found in the statute? There's no suggestion of that. Second, what the statute used to say and what it no longer says. Before 1980, as the Court is well aware, the statute was very different. It had language that explicitly included injurious environment as an element of neglect for ANCRA. That proved to be unworkable. It was primarily unworkable because this is a reporting statute. It's a statute that gives guidance to policemen and emergency room workers and teachers as to whether abuse or neglect has happened at a particular time. And DCFS learned that injurious environment didn't fit within that regime. It certainly doesn't fit within the regime, if you accept the agency's view now, that we're not just looking at an incident. We're looking at kind of a lifetime achievement analysis. We're looking at whether over the history of the mother's parenting experience, she's shown some conduct that somebody might think exposes a child to injurious environment. That kind of standard does not permit an emergency room worker or a teacher to decide whether they must report. And if they must report and fail to, they're subject to liability under ANCRA. So the legislature It's your argument that the statute provides an exhaustive list of definitions of neglect. Is that correct? For purposes of the child reporting statute, yes, Your Honor. And that any of the allegations that don't specifically refer to one of those, would they also be void? No, I'm not prepared to speak to all of the allegations. But there are certain allegations that give meaning to what it means to not provide clothing or shelter or to abandon a child. And the agency has the power to interpret those statutes, excuse me, that language found within the statute. But it doesn't have the power to interpret words that aren't there. And it doesn't have the power to interpret words that used to be there and were purposefully removed. And does it make any difference that the department asks for that language to be removed for clarification? Well, I think it really supports our position. Yes, I think it does make a difference. I'm not aware of a canon of statutory construction that says when something used to be in a statute and it's purposefully removed because it doesn't make sense, the agency therefore has the power to decide what it means. If the General Assembly wanted to give meaning to injurious environment, wanted to give guidance to those mandatory reporters that have to meet the standard, they could have done so. But they looked at it and said, we can't do that. And so we took it out. Is there any, the Juvenile Court Act, as I understand it, says if there's a finding of neglect on injurious environment, which is in the Juvenile Court Act, that that's an automatic indicated finding. Is there anything inconsistent about the position that you're urging this court to follow? I think not. I think not. The Juvenile Court Act is a very different statute. The Juvenile Court Act involves judicial proceedings where a judge makes a determination after hearing the evidence. It's not an administrative proceeding on this credible evidence standard. The Juvenile Court Act has two elements. There's an adjudicatory phase and then a dispositional phase, particularly in the dispositional phase where the trial court has statutory discretion to do what is in the best interest of the child. And after that determination, which is defined by statute, the court makes a determination as to whether the child was neglected. In this case, we're interpreting a statute that calls for lay people, policemen, doctors, social workers, therapists, whatever, emergency room workers, to on a quick spur of the moment decision, make a recommendation to DCFS whether there's abuse or neglect. And if they fail, they're subject to liability. Where that standard is different and the procedures are different, it's appropriate for the definition of neglect to be different. The legislature can reasonably and has reasonably decided to hold mandatory reporters to a different standard than a court, after reviewing the law, the cases, the pronouncements of this court and others, can apply. And I think we can take some comfort from what the legislature did last year after the appellate court ruled here. The post-decision enactment by the legislature does not endorse DCFS's position. It does not say that injurious environment is an element of neglect. It doesn't come flooding back into the statute. Instead, that pronouncement, again, focused on whether the child was receiving care. The statute looks to whether there was likelihood of harm, again, not shown here, and the parent blatantly disregarded parental obligations, which is defined as an incident with a real significant obvious risk of harm, so obvious that a reasonable parent would take action. So that's a very different standard than Allegation 60. The agency argues here that they put that language back in the statute almost as belt and suspenders. It was in there already, but we'll put it in again. Again, that's usually called surplusage, and we don't respect that. And that's why I think the agency's interpretation of what happened back in 1980 should be rejected, because there the legislature looked at the statute and said, it doesn't make sense, this injurious environment language. It doesn't make sense. We have to take it out of there, and that decision must be respected. DCFS, in effect, is arguing that when the language was put in in 1975, it was unnecessary, and when it was taken out in 1980, that that action was without effect. And when the language was again put back in 2012, that again was without effect. In other words, the legislature is acting across the street frivolously. They're passing laws that don't change anything, and that's not what our statutory interpretation statutes say, or cases rather say. I'd now like to turn to the second question, the evidence question. And here I think I need to start with what the question was. I think I believe she said the legislative history supports the fact that that was put in because of this appellate court opinion. I have no doubt that it was put in because of this appellate court opinion. But the question is, what did the legislature intend to correct? They didn't put back in Allegation 60. They didn't adopt Allegation 60. They passed a statute that was that says, okay, we'll allow DCFS to pursue injurious environment cases going forward. But in order to do so, they have to satisfy two conditions. They have to show a likelihood of harm. That's not in Allegation 60. And they have to show a blatant disregard of parental obligations. That's not in Allegation 60. So I think the legislative action can only be read consistently with the argument that we're making, which is when the legislature amended the statute in 1980, it did not permit what the agency did when it passed the regulation containing Allegation 60. Turning to the evidence question, I want to address first the agency's argument that this charge involved more than one day. That is an argument that, as we cite the statement in the brief, the agency took the position that this charge was about what happened on January 29th. And really, it has to be that. That has to make sense under the reporting statute. This is not a juvenile court act proceeding where the court has the power to look at more, to look at events that took place over an extended period of time. The agency did not report Julie Q for what happened on that day. And on January 29th, there were two witnesses to what happened. There was Julie Q and there was her daughter MQ. Julie Q testified and denied she'd been drinking. Now, even if you find that testimony to be incredible for whatever reason, the appellate court concluded correctly there was no contrary proof as to what happened on January 29th. There was evidence of alcohol testing both before and after, not days, but reasonably contemporaneously. And all of the alcohol testing was negative. There were witnesses who dealt with Julie Q in the days before and after this. Her substance abuse advisor, her AA sponsor, people in the school, they testified she had not been drinking. Her therapist testified that her substance abuse had progressed to the point where she was a late-stage alcoholic. She could not turn it on and off. She could not drink a little and then stop. If she started drinking, she wouldn't be able to stop and everyone would have known that she had relapsed. And there was no evidence that that conduct had taken place. So the sum of the evidence that the hearing examiner had before her was that Julie Q denied drinking. The extrinsic evidence supported that. And then there was this piece of paper in the record, a piece of paper written by a non-testifying witness about an interview with a non-testifying witness. The appellate court correctly ruled that that piece of paper was inadmissible hearsay. And the state concedes it's hearsay. It's actually double hearsay. And under the Administrative Procedure Act, the rules of evidence must apply here. But there is an exception if it's the kind of evidence that Julie Q denied. And the appellate court, we believe, correctly found that this is not that kind of evidence. The testimony here was a document. It wasn't testimony. It was a statement by a non-testifying witness. It wasn't a statement of what that person said or what was told to her. It's summarized and was a synopsis of a conversation. It was a conversation with a 9-year-old child. And there's some question about her truthfulness. Nine-year-old children, as any children, will sometimes say things that aren't true. This child had the unfortunate circumstance of being a pawn in her parents' divorce. And there was testimony below that from the substance abuse counselor that the child was told way too much by her father about her mother and her mother's drinking. And that influenced the way in which the child talked. And it's the same statement we hear over and over again. The child said the same thing in other incidents. So this evidence, particularly with the contrary evidence at the time, was inadmissible hearsay and does not have in-dish-over liability. DCFS, in addition, relied on other incidents. The Lake Bluff Police Reports, the fire in the family home in 2004. That doesn't relate to 2009. And at best, it's propensity evidence, excluded by Rule 404. And then they argue, and they argue today, that we had an obligation to call the investigator in order to cross-examine her about her note-taking. Calling Cobra would not have allowed us to get at what happened, because she was not the underlying testifier. That was the child. And moreover, I believe, as Justice Tice stated, a party opposing the burden of testimony is a party opposing the burden of proof, ordinarily does not have the obligation to deal with inadmissible testimony by calling the declarant or the once removed declarant to testify to explain what would have happened. They suggest here, as they have before, that the argument is waived. I think an examination of the briefs below may clear that we've  gotten to that point. On the question of timing, I'll touch on it only briefly. I think this case is controlled by Lyons. In Lyons, the court found a due process interest. The question in that case was whether a teacher satisfied the stigma plus standard. Here, the same standard is satisfied by a parent who is now on a registry put out by the State of Illinois saying she's a neglectful parent. That affects her and her ability to meet the stigma plus standard. So in conclusion, we submit the appellate court's ruling was correct in all regards. The DCFS regulations here attempt to legislate in an area that the legislature has already resolved. And under our system, the executive carries out the laws. It does not pass laws contrary to the will of the General Assembly. And we submit that's what Allegation 60 has done. In addition, there was no evidence to support a charge even if a charge is permitted under the statute. Multiple hearsay standing alone cannot support a finding of neglect. And that finding of neglect gives rise to the stigma and stigma plus that this court has found to implicate due process protections which were not satisfied here. Thank you. Thank you. Just a few points on rebuttal, Your Honors. First, about the admission of unfounded reports. To be clear, there were no unfounded reports that were admitted during the hearing in this case. And they are not allowed to be admitted under the Department's regulations. But what was admitted was testimony underlying the incidents that happened in order to not only address the challenge, Julie Kuh's credibility, but also to put some context into the substance of the law we're talking about here, Allegation of Harm, which while a one-day incident precipitated the report, under the regulation itself contemplates looking at more than what happened on just one day. As far as mandated reporters, it is true that the Act is aimed at helping them to be able to report on a one-day incident. But it is not intended to help them determine whether to report. But as we explained in our brief, mandated reporters would only face consequences if they reasonably understood what the Allegation of Harm meant and willfully failed to report. If a mandated reporter has a reasonable reading of the allegation and determined that no report was necessary, no consequences would occur. And so these people who sat on the committee, who may become mandated reporters one day, helped to write the regulations that became the law. As for the evidentiary rulings, as I was trying to explain to your Honor in response to your question, DCFS submits the report, the investigation report, and calls the primary investigator to testify. That has always been the way that these proceedings have happened. And if a person wants to challenge someone who helped make the report, they should be made to subpoena that person, which is contemplated by the Department's regulations. The Department is submitting the report and the primary investigator to satisfy its burden of proof. If the other side wants to challenge the credibility of that person who took part of the investigation on, they should be made to call that person. And unless the Court has any other questions, the Department asks that it reverse the judgment of the appellate court. Thank you. Thank you, Ms. Wickern. Mr. Brody, we thank you for your arguments presented this morning. Case number 113783, Julie Q. versus the Department of Children and Family Services is taken under revised as agenda number 10. Mr. Marshall, we're going to take about a 10-minute break. The Supreme Court stands in recess until 1045.